**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MARIO J. DIANA,

     Plaintiff,

        v.

WILLARD OLIPHANT and CARMEN
ALTAVILLA,

     Defendants.

CIVIL ACTION NO. 3:05-CV-2338

(JUDGE CAPUTO)

**<u>MEMORANDUM</u>**

Presently before the Court is Defendants' Motion for Partial Summary Judgment on the Plaintiff's First and Fourth Amendment claims.  (Doc. 28.)  For reasons set forth below, the Court will deny Defendants' motion as to the First Amendment retaliation claim and Defendants' motion as to the Fourth Amendment claim.  As a federal question is before the Court pursuant to 42 U.S.C. § 1983, the Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

Plaintiff in this case is Mario Diana, who at the time relevant to the Complaint, was a Trooper in the Pennsylvania State Police stationed at Tunkhannock Barracks.  (Defs.' Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. ¶ 1, Doc. 29.) Defendants are Carmen Altavilla, who at the relevant time was a Captain in the State Police and commander of Troop P, and Willard Oliphant, who was then the staff lieutenant of Troop P.  (*Id.* ¶¶ 2-4.)

In 2003, Plaintiff Diana was on leave for a work related injury.  (*Id.* ¶ 5.)  He was

receiving Workers' Compensation and Heart and Lung Benefits during his leave.  (*Id.* ¶ 5; Pls.' Counterstatement of Undisputed Material Facts ¶ 6, Doc. 34.)  Workers' Compensation claims are generally handled between the injured member and the department headquarters.  (Doc. 29 ¶ 7.)  Department headquarters gives Troop Commanders directives to have correspondence delivered to the injured member, or to have the injured member go for an independent medical examination, but that is generally the extent of the Troop Commander's involvement.  (*Id.* ¶ 9.)  State Police regulations require that someone visits a member on sick leave or leave for a work related injury, but that obligation does not include the obligation or authority to investigate the person on leave.  (*Id.* ¶¶ 10, 11.)

Sometime after Plaintiff Diana was put on leave, Defendant Altavilla received correspondence from Deputy Commissioner Transue.  (*Id.* ¶ 12.)  There is a dispute as to whether Defendant Altavilla determined the date that Plaintiff was to return to work, or if that date was determined by Deputy Commissioner Transue.  (*Id.* ¶ 13; Doc. 34 ¶ 13.)  In any case, Defendant Altavilla was directed to have the correspondence regarding Plaintiff's return to work personally served on the Plaintiff.  (Doc. 29 ¶ 14.)   The correspondence was in the form of a letter, dated November 14, 2003, ordering Plaintiff Diana to return to work on Saturday, November 22, 2003.  (*Id.* ¶ 16.)  The letter further noted that "Should you fail to return to work, CompServices, Inc. will petition to the Bureau of Workers' Compensation to seek suspension of you workers compensation benefits and the Department will schedule an administrative hearing to seek cessation of the Heart and Lung Benefits."  (November 14, 2003 Letter from Captain Altavilla to

Trooper Diana, Doc. 34 Ex. 2.)  Around the time the letter was served, Plaintiff Diana and Defendant Altavilla spoke on the telephone.  (Doc. 29 ¶ 17.)  Defendant Altavilla told the Plaintiff that he was not aware of what was occurring with the Workers' Compensation claim, but Plaintiff did have an order to return to work and would be considered AWOL if he failed to return.  (*Id.* ¶ 18.)  Plaintiff Diana responded that his lawyer told him he did not have to return to work, and that the matter had to go through Workers' Compensation to fix the problem.  (*Id.* ¶ 19; Doc. 34 ¶ 19.)  Plaintiff alleges that he told Altavilla that he had doctor's orders that a return could result in injury requiring knee replacement surgery. (Doc. 34 ¶ 18.) Defendant Altavilla reiterated that he did not know what was going on with the Plaintiff's Workers' Compensation claim.  (Doc. 29 ¶ 20.)  Defendant Altavilla then asked Plaintiff to have his doctor contact the State Police doctor, and to contact the Human Resources office.  (*Id.* ¶ 21.)  During this phone call, Defendant Altavilla was polite and did not raise his voice.  (*Id.* ¶ 23.)

At the conclusion of the phone call, Plaintiff understood that Defendant Altavilla would be in touch by Friday regarding the return to work order.  (*Id.* ¶ 24; Doc. 34 ¶ 24.) On November 19, 2003, Plaintiff Diana called the Troop Administrative Manager ("TAM"), Cheryl Burton, as he had not heard back from Defendant Altavilla.  (Doc. 29 ¶ 25.) Plaintiff told Burton that there were problems with his Workers' Compensation claim, and that he had conflicting statements as to whether he had to return to work.  (*Id.* ¶ 26.) Diana then told Burton he needed to know what was going on, and that he expected to hear from Altavilla.  (*Id.* ¶ 27.)  Burton told him that she would take a message and have Altavilla get back to him.  (*Id.* ¶ 28.)

Defendant Altavilla asked Defendant Oliphant to return Plaintiff's call.  (*Id.* ¶ 30.) He requested that Oliphant call Diana on the taped line at the station to make sure that if Diana was not coming back to work as ordered, that he had made some arrangement with his lawyer and the personnel office.  (*Id.* ¶ 30.)  Oliphant then proceeded to call Diana on the taped line.  (*Id.* ¶ 31.)  Oliphant told Diana that he was calling for Captain Altavilla.  (*Id.* ¶ 32.)  He told Diana that he received an e-mail indicating that the order to return to work stood.  (*Id.* ¶¶ 32-33.)  Diana then told Oliphant that he was advised by his lawyer, and that his lawyer told him to listen to his doctor and the union.  (*Id.* ¶ 34.)  Diana also told Oliphant that he loved his job and would be there if he physically could.  (*Id.* ¶ 35.)  Oliphant then advised Diana that the only way he would be permitted to not show up to work was if there would be physical harm or if it were against the law.  (*Id.* ¶ 36.) Diana then told Oliphant that he had seen his doctor, who told him that he could not return to work.  (*Id.* ¶ 37.)  Oliphant stated that he did not know what to tell him, but that the order still stood.  (*Id.* ¶ 38.)  Diana then thanked him and said he would pass the information to his lawyers.  (*Id.* ¶ 39.)

There is a dispute as to whether there are taped lines at every desk.  (*Id.* ¶ 41; Doc. 34 ¶ 41.)  These taped lines sound beeps the conversations.  (Doc. 29 ¶ 42.)  Diana did not hear beeps on the line during his conversation with Oliphant.  (*Id.* ¶ 43.)  Diana did not discover that the phone call between himself and Oliphant had been recorded until later in the same day, when a union officer called him and informed him that the call had been taped. (*Id.* ¶ 44.)

After Oliphant and Diana finished their telephone conversation, Oliphant asked the

Troop Communications Specialist ("TCS") to make a tape of the conversation.  (*Id.*  ¶ 45.)

Oliphant then gave the tape to Altavilla upon his return to work.  (*Id.* ¶ 46.)  Altavilla did

not listen to the tape or have a transcript made of it.  (*Id.*  ¶ 48.)  However, Plaintiff

alleges that Gerry Williams, Vice President of the Fraternal Order of the Police Lodge,

heard the recording.  (Doc. 34 ¶ 47.)  Sometime later, a local union official approached

Altavilla and told him that one of the union lawyers wanted a copy of the tape.  (Doc. 29 ¶

49.)  Altavilla then sent the lawyer the tape.  (*Id.* ¶ 50.)

Altavilla called the station on the day when Diana had been ordered to return to

work.  (*Id.* ¶ 51.)  When Altavilla learned that Diana had not reported to work, he

assumed that Diana had worked out the issue with the personnel office.  (*Id.* ¶ 52.)

Altavilla returned to work the following Monday.  (*Id.* ¶ 53.)  Upon Altavilla's arrival, the

TAM informed him that Diana had not reported for work as ordered, but that Altavilla was

not required to do anything about it.  (*Id.* ¶ 54.)  The TAM further told Altavilla that the

matter would be handled through a Workers' Compensation hearing.  (*Id.* ¶ 55.)  As far

as Diana knows, the tape of the telephone conversation was never used in his Workers'

Compensation proceeding.  (*Id.* ¶ 56.)  Diana received his Workers' Compensation

benefits before the taped telephone call, and continued to receive those benefits after the

conversation occurred.  (*Id.* ¶ 57.)  Diana continued to receive those benefits until he was

released by a doctor to return to work on limited duty.  (*Id.* ¶ 58.)  However, Plaintiff

counters that he was discriminated against in other ways.  (Doc. 29 ¶ 58.)  These

discriminatory practices included a reassignment to a different station, assignments to the

busiest zones in the county, and questioning regarding his work.  (*Id.* ¶ 58.)

On November 11, 2005, Plaintiff filed a Complaint alleging civil rights violations of his First, Fourth, and Fourteenth Amendment rights, and claims under the Federal Communications Act and under the Pennsylvania's Wiretap Act.  (Doc. 1.)  On January 6, 2006, Defendants Oliphant and Altavilla filed a motion to dismiss the Plaintiff's First and Fourteenth Amendment claims, as well as his claims under the Federal Communications Act, 47 U.S.C. § 151 *et seq.* (Doc. 5.)  On August 21, 2006, the Court granted Defendants' motion with respect to the Fourteenth Amendment claim, and denied the motion with respect to the First Amendment claim and the statutory wiretap claim.  (Doc. 19.)  Defendants filed the present Motion for Partial Summary Judgment on the First Amendment and Fourth Amendment claims on May 29, 2007.  (Doc. 28.)  This motion is fully briefed and ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a

genuine one.  *See id.* at 248.   An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law.  *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case. . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party.  *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).  Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law.  *See Liberty Lobby*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.

**DISCUSSION**

Plaintiff alleges that Defendants violated 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance,
> regulation, custom or usage . . . subjects, or causes to be
> subjected, any citizen of the United States or other persons
> within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured. . . .

Plaintiff further alleges that Defendants are liable under Section 1983 for violations of his

constitutional rights under the First Amendment and the Fourth Amendment based upon

their actions under color of law.  Defendants do not challenge Plaintiff's allegations that

they were acting under color of law.  Therefore, the Court will look to whether a

constitutional violation occurred.

**I.      First Amendment Claim**

Defendants argue that Plaintiff has failed to demonstrate evidence of retaliation

under the First Amendment.  To establish a First Amendment retaliation claim based

upon the right to petition, the Court must employ a three-part inquiry.  First, the Plaintiff

has the burden of establishing that the activity is protected by the First Amendment. *San

Filippo v. Bongiovanni*, 30 F.3d 424, 430-31 & n.7 (3d Cir. 1994), *cert. denied*, 513 U.S.

1082 (1995).  Second, the Plaintiff must establish that the protected activity was a

substantial factor in the alleged retaliation.  *Id.*  In order to constitute retaliation within the

meaning of the second prong, the action must be sufficient to deter a person of ordinary

firmness from exercising his First Amendment rights.  *Thomas v. Independence

Township*, 463 F.3d 285, 296 (3d Cir. 2006).  To succeed on this second prong, Plaintiff

does not have to show "but-for" causation; rather, he must show only that "the exercise of

8

[his] First Amendment rights played some substantial role in the relevant decision."
*Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000).

If Plaintiff satisfies the first two prongs of the inquiry, the burden of persuasion shifts to the defendant, who "may defeat plaintiff's claim by demonstrating that the same action would have taken place even in the absence of the protected conduct." *San Filippo*, 30 F.3d at 430-31 & n.7.  This framework is borrowed from *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, in which the defendant must demonstrate the third prong by a preponderance of the evidence.  *See* 429 U.S. 274, 287 (1977).

A.     Protected Activity

The First Amendment's Petition Clause protects a public employee from retaliation for filing non-sham lawsuits, grievances, and other petitions directed at the government or its officials.  *See San Filippo,* 30 F.3d at 439.  The filing of a formal petition is protected without regard to whether the petition addresses a matter of public concern.  *Id.* at 442. Such a petition is protected as long as it is filed in good faith, and the petition is not a sham.  *Id.*

Workers Compensation claims are classified as formal petitions not requiring a showing of public concern.  *Id.* at 439 n.18.  Plaintiff in this case has demonstrated sufficient evidence with regard to engaging in a protected activity.  Plaintiff filed a Workers Compensation claim.  There is no evidence presented that Plaintiff Diana's Workers Compensation claim was a "sham."  As a good faith Workers Compensation claim has specifically been protected within the meaning of the Petition Clause by the Third Circuit Court of Appeals in *San Filippo*, Plaintiff has demonstrated sufficient

evidence of a protected activity.

    B.    Ordinary Firmness and Substantial Factor

    The second element considers whether the alleged retaliatory actions were sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. *Thomas*, 463 F.3d at 296. "The effect of the alleged conduct on the employee's freedom of speech need not be great in order to be actionable, but it must be more than *de minimus*." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (internal quotation marks omitted). However, "[e]ven 'an act of retaliation as trivial as failing to hold a birthday party for a public employee,' if 'intended to punish her for exercising her free speech rights,' may be actionable if sufficient 'to deter a person of ordinary firmness' from exercising his or her First Amendment rights." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006) (quoting *Suppan*, 203 F.3d at 234-35 (citing *Rutan v. Republican Party*, 497 U.S. 62, 76 n.8 (1990))). The Third Circuit Court of Appeals further held that the threshold for a First Amendment retaliation claim is very low and "a cause of action is supplied by all but truly de minimus violations." *Id.* (citing *Suppan*, 203 F.3d at 234-35).

    Plaintiff faced several potentially retaliatory acts subsequent to the filing of his Workers Compensation claim. These include the taping of the conversation between Defendant Oliphant and Plaintiff Diana, as well as the treatment of Plaintiff Diana after he returned to work.

    The taping of the conversation between Defendant Oliphant and Plaintiff Diana may be construed as a retaliatory act in and of itself. In Defendants' brief, they argue that the taped conversation is not the sort of act that amounts to retaliation under the First Amendment because Diana was not likely to be deterred from pursuing his Workers

10

Compensation benefits.  However, Defendants misconstrue the "ordinary firmness" standard.  The standard applied for First Amendment retaliation is an objective standard dealing with a person of ordinary firmness, and does not consider the firmness of the particular Plaintiff.  The question is whether a person of ordinary firmness would be deterred from further exercising his or her right to petition pursuant to the Workers Compensation claim.

Plaintiff states that he was unaware that his conversation with Defendant Oliphant was taped at the time.  Rather, he discovered the tape's existence later on that day subsequent to a conversation with Gerry Williams, the Vice President of the Fraternal Order of Police Lodge.  Plaintiff further noted that Defendant Oliphant, with whom he had the conversation, "was my contact person for my Comp case because he was the Staff Lieutenant."  (Diana Dep. 91:6-18, Oct. 13, 2006, Doc. 34 Ex. 1.)  Defendant Altavilla further explained that the Staff Lieutenant, in this case, Defendant Oliphant, acted as "the liaison between the Department and more specifically the Troop and that particular individual on the Workman's Comp claim."  (Altavilla Dep. 23:6-13, Oct. 13, 2006, Doc. 34 Ex. 5.)  However, Plaintiff does not know if the tape was ever given to Workers Compensation.  (Diana Dep. 102:2-8, Doc. 34 Ex. 1.)  In this case, the Staff Lieutenant in charge of Plaintiff's Workers Compensation case, under the direction of a superior, recorded a conversation regarding the Plaintiff's return to work.  Plaintiff Diana also stated that a Workers Compensation hearing was set up for after the phone call, and that he believes that a motion was filed to end his Workers Compensation benefits, although he never lost his benefits.  (Diana Dep. 102:24-103:7; 104:17-24, Doc. 34 Ex. 1.)  There is a question of material fact as to whether such a recording would deter a person of ordinary firmness from exercising his rights under Workers Compensation.  A reasonable

factfinder could determine that the recording of the conversation was sufficient "to deter a person of ordinary firmness" from exercising his First Amendment rights, and therefore summary judgment on the recording of the conversation is inappropriate at this time.

"'Determining whether a plaintiff's First Amendment rights were adversely affected by retaliatory conduct is a fact intensive inquiry focusing on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts.'" *Brennan v. Norton*, 350 F.2d 399, 419 (3d Cir. 2003) (quoting *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000) (emphasis omitted). Plaintiff Diana testified that he faced discriminatory treatment upon his return to work. This included a reassignment from Tunkhannock to Wyoming Headquarters when Plaintiff returned to work on limited duty. (Diana Dep. 13: 1-5, Doc. 34 Ex. 1.) Plaintiff also states that "My immediate Supervisors and Sergeant, they pretty much put me in the busiest zones. And then when I questioned the Sergeant he said you gotta be the Corporals about it." (Diana Dep. 67: 7-11, Doc. 34 Ex. 1.) He also stated that "I felt every time I turned around I was getting you know questioned about it. . . . I was always reprimanded about it I mean it wasn't a day you know when I wouldn't be." (Diana Dep. 68: 1-8, Doc. 34 Ex. 1.) This discriminating treatment alleged by the Plaintiff cannot stand as a retaliatory act on the part of Defendant Altavilla in this case. The evidence presented demonstrates that these actions were not attributed to Defendant Altavilla, but to Plaintiff's other co-workers and superiors. In fact, the evidence presented demonstrates that Defendant Altavilla did not have a role in these alleged retaliatory actions. At the time Plaintiff Diana returned in February 2004, Defendant Altavilla had left Wyoming and gone to work as the Administrative Director of the Bureau of Drug Law. (Altavilla Dep.11: 7-13, Doc. 34 Ex. 5.) Thus, there is no basis for retaliation based upon

discriminatory treatment by Altavilla.

Furthermore, Plaintiff Diana noted that he did not know who made decisions regarding his assignment once he was returned to full duty.  (Diana Dep. 88:13-26, Doc. 34 Ex. 1.)  Plaintiff made no statements regarding retaliatory conduct upon his return to work by Defendant Oliphant.  The complained of retaliatory conduct after Diana's return to work cannot be attributed to Defendant Oliphant, and therefore this conduct cannot stand as a grounds for the retaliation claim.

Although the treatment that Plaintiff Diana received upon his return to work does not qualify as a retaliatory action, Plaintiff's claim for First Amendment retaliation still stands against both Defendants Oliphant and Altavilla based upon the recording of the conversation with Defendant Oliphant.  Therefore, the Court must consider the other portion of the second prong of the retaliation test, where the Plaintiff must also show that the protected activity was a substantial or motivating factor in Defendants' alleged retaliatory action.  It is sufficient if Plaintiff establishes that the exercise of his First Amendment rights played some substantial role in the relevant decision; Plaintiff need not establish that the retaliation was motivated solely or even primarily by the protected activity. *Katzenmoyer v. City of Reading*, No. Civ. A. 00-5574, 2001 WL 1132374, at *2 (E.D. Pa. Sept. 21, 2001).

At the time of the phone call, both Defendants Oliphant and Altavilla were aware of the existence of Plaintiff's Workers Compensation claim.  (Altavilla Dep. 16:10-17, Doc. 34 Ex. 5; Oliphant Dep. 4:21-5:14, Oct. 13, 2006, Doc. 34 Ex. 4.) In fact, the phone call between Oliphant and Diana was made to discuss Plaintiff's return to work.  (Altavilla Dep. 35:20-37:5, Doc. 34 Ex. 5; Oliphant Dep. 7:10-9:3, Doc. 34 Ex. 4.)   Therefore, there is question of material fact as to whether the protected activity was a substantial or

motivating factor in the taping of the conversation.

_____Viewing this evidence in the light most favorable to Plaintiff, the Court concludes that there are issues of material fact as to whether that the alleged taping of the phone call would deter a person of ordinary firmness, and whether the Workers Compensation claim was a substantial factor in the alleged retaliation.  Because of the factual disputes surrounding the second prong, it is not necessary to address the third prong, and Defendants' motion for summary judgment will be denied.

## II.    Fourth Amendment Search and Seizure Claim

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  The Supreme Court in *Katz v. United States*, 389 U.S. 347 (1967) first secured the right of a person against government-initiated electronic surveillance.  The Supreme Court in *Smith v. Maryland*, 442 U.S. 735 (1979) enunciated the test for Fourth Amendment search and seizure based upon *Katz*, stating that "this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable' or a 'legitimate expectation of privacy' that has been invaded by government action."  *Id.* at 740.  The Fourth Amendment inquiry is twofold.  First, the Court must consider "whether the plaintiff, by his conduct, has 'exhibited an (actual) subjective expectation of privacy.'"  *Id.* (quoting *Katz*, 389 U.S. at 361).  This inquiry essentially considers whether 'the individual has shown that 'he seeks to preserve [something] as private.'"  *Id.* (quoting *Katz*, 389 U.S. at 351).  The second question is whether the "subjective expectation of privacy is 'one that society is prepared to recognize as 'reasonable.'"  *Id.* (quoting *Katz*, 389 U.S. at 361).  In determining if the expectation is reasonable, the individual's

expectation, viewed objectively, must be "justifiable" given the circumstances. *Id.*

A.      Expectation of Privacy in Criminal Cases

Defendants argue that the Plaintiff had no subjective expectation of privacy in his conversation with Defendant Oliphant because Oliphant was aware of and consented to the recording of the conversation.  The issue of consent generally arises in Fourth Amendment criminal cases, where a Defendant seeks to suppress a recording made by a government informant.  In *United States v. White*, 401 U.S. 745 (1971), the Supreme Court considered the suppression of testimony by a government informant.  *White* noted that no matter how strongly a defendant may trust an apparent colleague, his expectations are not protected by the Fourth Amendment when the colleague is a government informant.  *Id.* at 749 (citing *Hoffa v. United States*, 385 U.S. 293 (1966)). Accordingly, the law does not find justify privacy expectations when a colleague turns to police, or when the person is an informant.  *Id.   White* specifically notes that "one contemplating illegal activities must realize and risk that his companions may be reporting to the police." *Id.*

In expanding upon the consent issue, the Supreme Court in *United States v. Caceres*, 440 U.S. 741 (1979) considered the suppression of recorded evidence in a case where the defendant was charged with bribing an Internal Revenue Service agent. The case expanded upon *White*, and held that if the conduct of the agent does not invade the constitutionally justifiable expectation of privacy, neither does a simultaneous recording.  *Id.* at 751.

The Third Circuit Court of Appeals in *United States v. Lee*, 359 F.3d 194, 198 (3d Cir. 2004) similarly dealt with the expectation of privacy in audio and video surveillance between a government informant and a defendant involved in the alleged payment of

15

bribes by boxing promoters.  In *Lee*, the government did not obtain a warrant prior to the monitoring and recording of the meetings between the defendant and the government informant.  *Id.* at 199.  However, the court ruled that the defendant's Fourth Amendment rights were not violated, and that the case was "governed by the well-established principle that a person has no legitimate expectation of privacy in conversations with a person who consents to the recording of the conversations."  *Id.* at 201.  However, this case is also steeped in the idea that "'a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.'"  *Id.* at 200 (quoting *Hoffa*, 385 U.S. at 302).

However, these consent cases deal specifically with criminal defendants, where criminal actions were recorded or monitored by a government informant, or turned over to the government.  Although these cases cite the general proposition that "consent" occurs at any time there is consent by one party, these cases all deal with consent in a criminal case.  This case is distinguishable because the Plaintiff was involved in no wrongdoing.

When considering the facts in the case at bar, the consent analysis does not apply.  Although many courts cite the general proposition that consent destroys the subjective expectation of privacy, the courts cite this proposition in the context of criminal cases where there is a criminal wrongdoing. These courts generally further cite the proposition that a wrongdoer speaks at his own risk.  In this case, Plaintiff Diana was not a wrongdoer.  Nor was he involved in a criminal case.  Defendant Oliphant was not an informant.  Rather, this is a civil case where one police officer called another and recorded their conversation.  Such a case should be analyzed in the context of a civil matter.

B.      Expectation of Privacy in Civil Cases

The courts have considered various civil cases regarding the expectation of privacy within the realm of the Fourth Amendment.  These cases generally involve taped calls from prison, or calls from police or fire departments.

In *In re State Police Litigation*, 88 F.3d 111 (2d Cir. 1996), numerous prisoners alleged in a civil case that phone calls from the State Police Barracks were intercepted, recorded, disclosed and used without consent of the participants.  *Id.* at 115.  The phones had various levels of warning systems ranging from beep tones to warning labels to no form of notice at all.  *Id.* at 116-17.  The Second Circuit Court of Appeals noted that there were questions of fact regarding the subjective and objective expectations of privacy of the Plaintiffs.  *Id.* at 119.  If notice existed, in form of a beep tone or warning label, such notice would defeat an objective expectation of privacy.  *Id.*  Since there was a question of fact as to whether such notice existed, the court held that summary judgment was inappropriate.  *Id.*  The Middle District of Pennsylvania has similarly held that, when there is notice, there is no expectation of privacy on behalf of a prisoner or his caller.  *United States v. Harrison*, 986 F. Supp. 280 (M.D. Pa. 1997).  The court noted that courts have been consistent in holding that an inmate does not have a subjective expectation of privacy in outbound calls made from prison.  *Id.* at 280; *see also United States v. Solomon*, No. 02:-05-CR-385, 2007 WL 2702792 (W.D. Pa. 2007) (holding that an inmate had no expectation of privacy in non-attorney telephone calls made from prison).  The court further held that a defendant did not have a subjective expectation of privacy in an incoming phone call from an inmate.  *Harrison*, 986 F. Supp. at 280.

Although it has been held that prisoners have a reduced expectation of privacy in their telephone calls, such a reduced expectation does not necessarily apply to ordinary

17

citizens, such as those employed by a police department.  In *Walden v. City of Providence*, 495 F. Supp. 2d 245 (D.R.I. 2007), a telephone recording system was used in recording incoming and outgoing calls in the Providence Public Safety Complex.  *Id.* at 249.  The system was installed with no beep tones or verbal announcement to callers that the calls were being recorded.  *Id.* at 250.  However, the mayor sent a department wide email to over five hundred (500) personnel regarding the new recording system.  *Id.* at 250-51.  All plaintiffs in the case claim they never received any notice, including the email.  *Id.* at 251.  In this case, the court held that the plaintiffs had a subjective expectation of privacy, as there was no evidence that the Plaintiffs received the email, that they consented to the recording, or that they knew their calls were being recorded.  *Id.* at 254.

      Similarly, in *PBA Local No. 38 v. Woodbridge Police Dep't*, 832 F. Supp. 808 (D.N.J. 1993), former and current police officers sued the Woodbridge Police Department, among other defendants, for electronically listening and using taping devices in various parts of the police headquarters and on the building's phone lines.  Their claims included a violation of 42 U.S.C. § 1983 for their right to privacy under the Fourth Amendment.  *Id.* at 814.  This case specifically addressed the plaintiffs' reasonable expectation of privacy.  *Id.* at 817.  The facts specified that all but two lines in the building were subject to recording, and that the recording was signified by a beep every five seconds.  *Id.*  The deposition testimony indicated that it was general knowledge among police officers that the beeps signified that the lines were being recorded.  *Id.* at 818.  The court noted that it was "clear that plaintiffs did not have a reasonable expectation of privacy in conversations which took place over the beeped lines."  *Id*.  The court noted that as the plaintiffs knew the beeped lines were recorded, they had no

subjective expectation that the conversations would be private. *Id.* Furthermore, the court stated that as it was common knowledge that beeped phone lines were recorded, the expectation of privacy could not be objectively reasonable. *Id.* However, the plaintiffs also alleged claims arising out of the alleged interception of non-beeped phone lines. *Id.* at 819-20. The court granted summary judgment on some of these claims based on lack of evidence, rather than expectations of privacy. *Id.* at 820. However, when there was evidence based on the use of beepless phone lines, the court refused to grant summary judgment to the defendants on those claims. *Id.*

The Northern District of Illinois also considered the expectation of privacy in a police building in *Abbott v. Village of Winthrop Harbor*, 953 F.Supp. 931 (N.D. Ill. 1996). In this case,  current and former employees of the police department, as well as non-employees, who engaged in conversations of a taped telephone line brought suit against the village and the police chief. *Id.* Prior to recording the conversations, the police chief explicitly issued a memorandum stating that one of the lines would not be recorded. *Id.* at 942. Without issuing contrary notice, the line was then recorded. *Id.* The plaintiffs alleged violations of the Fourth Amendment, giving rise to a §1983 cause of action. *Id.* at 941. The court noted that "[t]he Fourth Amendment strictly prohibits searches performed without judicial authorization unless specific exceptions exist, *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), none of which are applicable here." *Id.* The court noted that "it is a violation to wiretap or otherwise monitor the private communications of another without authorization, notice or consent." *Id.* at 943. The court also addressed the issue of implied consent on the part of the plaintiffs. *Id.* at 944. The plaintiffs disputed whether beep tones were used on the line. *Id.* In discussing the wiretap law, the court stated that "knowledge of the capability of monitoring alone cannot

be considered implied consent." *Id.*  The court then distinguished cases of implied

consent.  *Id.* at 945 (citing *Jandak v. Village of Brookfield*, 520 F. Supp. 814, 824-25

(N.D. Ill. 1995) (where the police officer knew or should have known that the line was

recorded, and that an unrecorded line was provided for personal calls); *Simmons v.*

*Southwestern Bell Telephone Co.*, 452 F. Supp. 392, 393-94 (W.D. Okl. 1978, *aff'd*, 611

F.2d 342 (10ᵗʰ Cir. 1979) (plaintiff made personal calls on a business line which he knew

to be regularly monitored, and had previously been warned to stop making personal calls

on that line)).  As a memorandum existed in this case stating that the line would not be

recorded, implied consent could not be nullified, even if beep tones did exist.  *Id.*

Furthermore, there was a question of fact as to whether the Plaintiffs gained knowledge

that the lines were being recorded.  *Id.*

⎯⎯⎯After considering the various cases involving the expectation of privacy in the civil

context, the Court is of the opinion that there is a question of material fact regarding

Plaintiff Diana's expectation of privacy, both subjective and objective.  This case is

distinguishable from both *In re State Police Department* and *Harrison.*  In those two

cases, the courts considered the expectation of privacy with regard to inmates.  It was

determined that inmates have a lessened subjective expectation of privacy.  Such a

restriction does not apply to a citizen such as Plaintiff Diana.

In contrast, *Walden*, *PBA Local No. 38*, and *Abbott* all dealt with the recording of

citizen conversations from police buildings.  In *Walden*, the court refused to grant

summary judgment for the defendants, as there were questions of material fact regarding

the plaintiffs' expectations of privacy.  In that case, the plaintiffs were found to have a

subjective expectation of privacy, as they had no notice of the recordings, nor did they

consent.  Furthermore, as there was no evidence of notice, the court refused to hold as a

matter of law that the plaintiffs' expectation of privacy was objectively unreasonable.

In the case at bar, there are questions of material fact that go to both the subjective and objective reasonableness of Plaintiff Diana.  There are several issues that address the issue of reasonableness.  Defendant Altavilla noted that he would order a subordinate to tape a call with another officer in "a situation where you're changing somebody's shift. . . ." or in cases where "I would have to be absent."  (Altavilla Dep. 50:20-51:3, Doc. 34 Ex. 5.)  Therefore, Plaintiff Diana may have had a subjective expectation of privacy on the basis that the taped lines were generally used to change shifts.

Defendants stated that they did not tell Plaintiff Diana that he was on a recorded line, so there was no notice to Plaintiff in that manner.  Defendant Altavilla further testified that he never instructed Defendant Oliphant to inform Plaintiff Diana that the call was to be taped.  (Altavilla Dep. 69:4-71:24, Doc. 34 Ex. 5.)  But, Defendants believed that Plaintiff Diana would hear the beeps, and would therefore be given notice of the recording.  (Altavilla Dep. 69:4-71:24,  Doc. 34 Ex. 5.)  However, Plaintiff Diana alleges that he did not hear any beep tones while on the line with Defendant Oliphant. (Diana Dep. 54:15-18, Doc. 34 Ex. 1.)  Furthermore, Plaintiff Diana acknowledged that the beeps could be turned off, or calls could be diverted to an unrecorded line in the police station. (Diana Dep. 130:15-17, Doc. 34 Ex. 1.)  Plaintiff also states that Gerry Williams, the Vice President of the Fraternal Order of the Police Lodge, who informed him of the existence of the tape, had heard the tape played, and did not hear a beep on the recording.  (Diana Dep. 135:16-24, Doc. 34 Ex. 1.)

Defendant Oliphant, in contrast, stated that there were beep tones on the line. (Oliphant Dep. 19:5-20:20, Doc. 34 Ex. 4.)  Defendant Altavilla further testified that, to his

knowledge, it would not be possible to tape a conversation without the presence of a beep.  (Altavilla Dep. 54:9-18,  Doc. 34 Ex. 5.)  Defendant Oliphant agreed with that sentiment.  (Oliphant Dep. 15:3-13, Doc. 34 Ex. 4.)  The existence of beep tones on this line is important to both the subjective and objective expectations of privacy.  As the existence of audible beep tones could demonstrate notice, a material question of fact still exists.  The existence of the tones would place the case in the realm of *PBA Local No. 38*, which found that lines with beep tones destroyed the expectation of privacy on the part of the police officers, as it was common knowledge that beep tones indicated that a conversation was being recorded.  In essence, the existence of such beep tones could indicate an implied consent by Plaintiff Diana.  Although the *Abbott* court held there was no implied consent based upon the existence of beep tones, this was based upon the fact that the police chief had distributed a memorandum stating that one line would be used for personal calls and not recorded.  No such facts exist in this case.  Therefore, the existence of beep tones is critical to the subjective and objective expectations of privacy of the Plaintiff.

One of the other distinguishing facts in this case is that this was an outgoing call from Defendant Oliphant at the police station to Plaintiff Diana on his cellular phone.  This fact may also change the privacy expectations of Plaintiff Diana.  In the cases of *Walden, Abbott,* and *PBA Local No. 38*, the courts were mainly considering the outgoing calls made by persons located in the police buildings.

There is also a question of fact as to whether all phones at the police station are recorded.  Defendant Altavilla notes that all communications desks have taped lines with beeps, but Plaintiff Diana notes that there are lines at the police barracks which are not recorded.  (Altavilla Dep. 54:3-14, Doc. 34 Ex. 5; Diana Dep. 130:18-131:4, Doc. 34 Ex.

1.)  If all phones are not recorded, then a reasonable expectation of privacy may arise.  If no beep tones were audible at the time of the phone call, and unrecorded lines were in existence at the police station, Plaintiff Diana could have an actual, reasonable expectation of privacy in his phone call with Defendant Oliphant, as the failure to provide beep tones could indicate that Defendant was calling from an unrecorded line.

_____As there are numerous questions of material fact related to both the subjective and objective expectations of privacy of the Plaintiff, summary judgment is inappropriate on the Fourth Amendment claim.

**CONCLUSION**

Construing the facts in a light most favorable to Plaintiff, the Court finds that Defendants' motion for summary judgment will be denied against both Oliphant and Altavilla as to the First Amendment retaliation claim based upon the alleged taped conversation.  The Defendants' motion for summary judgment based upon the Fourth Amendment will also be denied as to both Defendants.

An appropriate order shall follow.


November 13, 2007_____                              /s/ A. Richard Caputo_____
Date                                                              A. Richard Caputo
                                                                     United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MARIO J. DIANA,

     Plaintiff,                         NO. 3:05-CV-2338

          v.

                                    (JUDGE CAPUTO)

WILLARD OLIPHANT and CARMEN
ALTAVILLA,

     Defendants.

## ORDER

    **NOW**, this ___13th_____ day of November, 2007, **IT IS HEREBY ORDERED** that

Defendants' Partial Motion for Summary Judgment (Doc. 28) is **DENIED** as to

Defendants Oliphant and Altavilla with respect to the Plaintiff's First Amendment

retaliation claim based on the taped conversation.  The Defendants' Partial Motion for

Summary Judgment (Doc. 28) is also **DENIED** as to both Defendants based upon the

Plaintiff's Fourth Amendment search and seizure claim.

                                        /s/ A. Richard Caputo_____
                                        A. Richard Caputo
                                        United States District Judge