**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MARIO J. DIANA,

     Plaintiff,

          v.

WILLARD OLIPHANT and CARMEN
ALTAVILLA,

     Defendants.

NO. 3:05-cv-2338

(JUDGE CAPUTO)

## MEMORANDUM

Presently before the Court are Defendants Carmen Altavilla and Willard Oliphant's post-trial motions, including a renewed Motion for Judgement as a Matter of Law pursuant to Federal Rule of Civil Procedure 50, a Motion for a New Trial pursuant to Federal Rule of Civil Procedure Rule 59, or, in the alternative, a Motion for Remittitur.  (Doc. 102.)  For the reasons stated below, the Court will deny Defendants' renewed Motion for Judgment as a Matter of Law and their Motion for a New Trial.  The Court will grant in part and deny in part their Motion for Remittitur.

## BACKGROUND

Plaintiff in this case is Mario Diana.  At the time of the events giving rise to his suit, Plaintiff was a Pennsylvania State Police ("PSP") trooper stationed at Tunkhannock police barracks, Troop P, Wyoming County.  (Trial Tr. vol. 2, 83-84, Apr. 8, 2008.)  Defendants are Carmen Altavilla, who at the relevant time was a PSP captain and troop commander of Troop P, and Willard Oliphant, then staff lieutenant of Troop P.  (Trial Tr. vol. 1, 61, 63, Apr. 7, 2008.)

In January 2003, Plaintiff went on leave for a work-related injury.  (Trial Tr. vol. 2, 84.)

He received Worker's Compensation as well as Heart and Lung benefits during his time on leave. (*Id*. at 85, 92.) On November 12, 2003, Defendant Altavilla received a "return to work order" for Plaintiff from Lieutenant Colonel Cynthia Transue, who directed him to have the order served on Plaintiff. (Trial Tr. vol. 1, 73-74, 76.) The captain signed the order, included November 22, 2003 as the date Plaintiff was to return to work, and directed a trooper to deliver it to Plaintiff. (*Id*. at 75-76.) On November 14, 2003 Plaintiff was personally served with the order, informing him that he must return to work or the PSP would seek to suspend his benefits. (Trial Tr. vol. 2, 89, 91-92.)   The order also informed him to call Captain Altavilla, which he did the same day.  (Trial Tr. vol. 1,  77.)  Plaintiff was distressed because his doctor said he should not return to work at that time, as he was still injured.  (Trial Tr. vol. 2, 93-94.)  The captain asserts he told Plaintiff that he should have his doctor and lawyer contact the PSP personnel department to get the situation worked out.  (Trial Tr. vol. 1, 81.) Some conflicting evidence suggests the captain told Plaintiff he did not have to return unless he told him to do so.  (Trial Tr. vol. 2, 59-60.)  Plaintiff also testified that the captain directed him to call back on Friday, November 21.  (*Id*. at 100.)

On November 21, Plaintiff called the barracks and requested to speak with Defendant Altavilla.  (Trial Tr. vol. 1, 79.)  The captain was out that day, but when informed of Plaintiff's call by the troop administrative manager, he contacted Defendant Oliphant and directed him to return Plaintiff's call using one of the recorded telephone lines in the police barracks.  (*Id*. at 79, 82.)  Defendant Oliphant called Plaintiff and informed him that the order was still in effect and Plaintiff must return to work.  (Trial Tr. vol. 2, 95.)  Plaintiff maintains that he did not know the call was being recorded.  (*Id*. at 96.)  Defendants maintain that audible beeps were emitted on the recorded telephone line that would put Plaintiff on notice of the

2

recording.  (*Id*. at 72.)

Immediately after ending the call with Plaintiff, Defendant Oliphant contacted Ronald Zukosky, the troop's communication specialist, and requested he make a taped copy of the conversation.  (*Id*. at 73.)  While Zukosky was making the copy, another officer, Gerald Williams, overheard a portion of the call.  (*Id*. at 8-9.)  Williams then telephoned Plaintiff and informed him that his call with Defendant Oliphant had been recorded.  (*Id*. at 10, 101.)

On November 11, 2005, Plaintiff filed a Complaint (Doc. 1) alleging violations of his rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution as a result of the recorded call as well as claims under the Federal Communications Act (superceded by Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq*. ("Title III")) and Pennsylvania's Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701 *et seq*. ("Pennsylvania Wiretap Act").  Defendants moved to dismiss the Complaint.  (Doc. 5.)  The Court granted the motion with respect to the Fourteenth Amendment claim, interpreted the Federal Communications Act claim as stating a claim under Title III, and denied the motion as to all other claims.  (Doc. 19.)  On May 29, 2007, Defendants moved for partial summary judgment on Plaintiff's First and Fourth Amendment claims.  (Doc. 28.)  The Court denied the motion.  (Doc. 38.)  Defendants moved for reconsideration of the denial (Doc. 39), which the Court also denied (Doc. 48).

The case proceeded to trial in April 2008 on the four remaining claims.  Defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 at the close of Plaintiff's case and again at the close of their case.  At the close of Defendants' case, the Court granted their motion for judgment as a matter of law as to Plaintiff's First Amendment claim.  The remaining three claims, under the Fourth Amendment, Title III, and

the Pennsylvania Wiretap Act, were submitted to the jury.  The jury found Defendants liable

on each claim and awarded Plaintiff two hundred sixty-two thousand, one hundred twenty-six

dollars ($262,126) in compensatory damages and two hundred thirty-eight thousand, eight

hundred seventy-eight dollars ($238,878) in punitive damages.  (Doc. 93.)  In accordance

with the jury's finding of liability on the Title III claim, the Court issued an Order awarding ten

thousand dollars ($10,000) in statutory damages against each Defendant.  (Doc. 95.)  The

Court entered judgments on the jury verdict and Order on April 17, 2008.  (Doc. 96, 97.)

Following entry of judgment, Defendants filed the present post-trial motions, including

a renewed motion for judgment as a matter of law and a motion for a new trial or, in the

alternative, for remittitur.  (Doc. 102.)  These motions are fully briefed and ripe for

disposition.

## LEGAL STANDARDS

### I.    Rule 50(b)

Under Rule 50(b), a party may renew its request for a motion for judgment as a matter

of law by filing a motion no more than ten (10) days after judgment is entered.  Fed. R. Civ.

P. 50(b).  In the present case, Defendants' Rule 50(b) motion was timely filed.  (Doc. 102.)

Judgment notwithstanding the verdict should be granted sparingly.  *Walter v. Holiday Inns,*

*Inc.,* 985 F.2d 1232, 1238 (3d Cir. 1993).  In deciding whether to grant a Rule 50(b) motion:

> the trial court must view the evidence in the light most favorable
> to the non-moving party, and determine whether the record
> contains "the minimum quantum of evidence from which a jury
> might reasonably afford relief."  The court may not weigh
> evidence, determine the credibility of witnesses or substitute its
> version of the facts for that of the jury.  The court may, however,
> enter judgment notwithstanding the verdict if upon review of the

4

> record, it can be said as a matter of law that the verdict is not
> supported by legally sufficient evidence.

*Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691-92 (3d Cir. 1993), *abrogation on other grounds recognized by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.*, 316 F.3d 392 (3d Cir. 2003) (citations omitted).  A Rule 50 motion will be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving [the nonmovant] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993).  The question is not whether there is literally no evidence supporting the non-moving party, but whether there is evidence upon which the jury could properly find for the non-moving party. *See Walter,* 985 F.2d at 1238 (citing *Patzig v. O'Neil,* 577 F.2d 841, 846 (3d Cir. 1978)).

## II.   Rule 59(a)

Under Rule 59(a), motions for a new trial must be filed within ten (10) days of the date the judgment was entered.  Fed. R. Civ. P. 59.  Defendants' motion for a new trial was timely filed.  (Doc. 102.)  The decision to grant a new trial is left to the sound discretion of the trial judge.  *See Blackiston v. Johnson,* No. 91-5111, 1995 U.S. Dist. LEXIS 13823, at *3 (E.D. Pa. Sept. 19, 1995), *aff'd* 91 F.3d 122 (3d Cir. 1996), *cert. denied* 519 U.S. 953 (1996). Courts have granted motions for a new trial where:  (1) there is a significant error of law, to the prejudice of the moving party; (2) the verdict is against the weight of the evidence; (3) the size of the verdict is against the weight of the evidence; or (4) counsel engaged in improper conduct that had a prejudicial effect on the jury.  *Maylie v. Nat'l R. R. Passenger Corp.,* 791 F. Supp. 477, 480 (E.D. Pa.), *aff'd* 983 F.2d 1051 (3d Cir. 1992).  Where the evidence is in

conflict, and subject to two (2) or more interpretations, the trial judge should be reluctant to grant a new trial. *Klein v. Hollings,* 992 F.2d 1285, 1295 (3d Cir. 1993).

## DISCUSSION

### I.      Renewed Motion for Judgment as a Matter of Law

#### A.      Qualified Immunity

Defendants first argue in their renewed motion for judgment as a matter of law that they are entitled to qualified immunity with respect to Plaintiff's Fourth Amendment claim and Title III claim.  "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Determining whether qualified immunity applies is a two-step process: "First, the court must determine whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right." *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006).  Second, "the court must determine whether the constitutional or statutory right allegedly violated by the defendant was 'clearly established.'"  *Id.*; *see also Pearson v. Callahan*, --- U.S. ---, 2009 U.S. LEXIS 591 (Jan. 21, 2009) (holding there is no mandatory sequence in applying the two steps).  A right is clearly established when its meaning is "sufficiently clear that a reasonable official would understand what he is doing violates that right."  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

As to Plaintiff's Fourth Amendment claim, Defendants admit that at the time of the November 21, 2003 call to Plaintiff a clearly established rule existed that the surreptitious interception of a private telephone conversation without a warrant violates the Fourth

6

Amendment, absent some exception to the warrant requirement.  This rule was established under *Katz v. United States*, 389 U.S. 347 (1979).  However, Defendants argue that Title III contains an exception to the warrant requirement via 18 U.S.C. § 2510(5)(a)(iii), which excludes telephone conversations recorded in the ordinary course of a law enforcement officer's duties from liability under Title III.[1]

The Court does not agree with Defendants' argument.  The *Katz* court held that the interception of electronic communications is a search subject to the Fourth Amendment's warrant requirement.  *Katz*, 389 U.S. at 353.  It then observed that, under the warrant requirement, warrantless searches violate the Fourth Amendment unless they fall within "a few specifically established and well-delineated exceptions."  *Id*. at 357.  The warrant exceptions specifically cited, *id.* at 357-58, refer to those constitutionally-required exceptions developed by the Court under its Fourth Amendment jurisprudence, such as a search incident to arrest, *see Agnello v. United States*, 269 U.S. 20 (1925), "hot pursuit," *see Warden v. Hayden*, 387 U.S. 294 (1967), and a search conducted with consent, *see Zap v. United States*, 328 U.S. 624 (1946).  Additionally, the *Katz* court reasoned that such exceptions were unlikely to apply to electronic surveillance, as such a search involved no physical trespass and depends, by nature, on lack of notice.

---

[1]     Title III provides a civil remedy against a person who intentionally intercepts another's wire, oral, or electronic communications.  18 U.S.C. § 2520(a); 18 U.S.C. § 2511(1)(a).  The term "intercept" means the acquisition of such communications through the use of any "electronic, mechanical, or other device."  18 U.S.C. § 2510(4).  However, the statute creates an exception to liability by defining "electronic, mechanical, or other device" to exclude equipment "used by . . . an investigative or law enforcement officer in the ordinary course of his duties."  18 U.S.C. § 2510(5)(a)(ii).

Title III's law enforcement exception does not constitute an exception to the constitutional warrant requirement. It is not an exception under the Fourth Amendment itself, but rather an exception to the statutory definition of a wiretap that is subject to the requirements and liabilities of Title III. A recording exempted under § 2510(5)(a)(iii) is still subject to the constraints of the Fourth Amendment. Indeed, given that the legislative history of Title III evidences a strong congressional intent to create protections for privacy, it would be incongruous to conclude that Congress intended to diminish the protections of the Fourth Amendment's warrant requirement. *See Gelbard v. United States*, 408 U.S. 41, 48, 50 n. 7 (quoting from legislative history for proposition that Title III's purpose was to provide new protections for privacy by creating uniform federal standards for electronic surveillance by law enforcement).

Consequently, the Court does not agree with Defendants' argument that reasonable officers in their position, by relying on the law enforcement exception to Title III, would not have known they were violating the constitutional right established in *Katz*. Falling within the statutory exception signifies that one is exempted from civil or criminal liability under Title III. It does not mean that one is not constrained by the Fourth Amendment prohibition on warrantless searches.

As to Plaintiff's Title III claim, the Court will not consider this argument because it was not raised in Defendants' Rule 50(a) motion for judgment as a matter of law at trial. It is settled law in the Third Circuit that a post-trial Rule 50 motion can only be made on grounds specifically advanced in the party's pre-verdict Rule 50 motion. *Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 617 (3d Cir. 1989); *see also* Fed. R. Civ. P. 50 advisory committee's notes, 2006 amendments ("Because the Rule 50(b) motion is only a renewal

of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion.").

### B.     State Wiretapping Claim

Defendants argue they are entitled to judgment as a matter of law with respect to Plaintiff's state law claim because their actions fell within an exception to the Pennsylvania Wiretap Statute.  Again, because this argument was not advanced in Defendants' pre-verdict Rule 50 motion, the Court will not consider it in this motion.

### C.     Federal Wiretapping Claim

Defendants argue they are entitled to judgment as a matter of law with respect to Plaintiff's Title III claim because their actions fell within the law enforcement exception.  They argue they offered overwhelming evidence that Defendant's Oliphant's call to Plaintiff regarding a work-related matter on a recorded line was done in the ordinary course of Defendants' law enforcement duties.

However, the Court instructed the jury on the law enforcement exception, specifically noting that a telephone used by a law enforcement officer in the ordinary course of his duties is not a wiretap under Title III.  (Trial Tr. vol. 4, 110, Apr. 10, 2008.)  The Court further instructed the jury that the term "ordinary" was not limited to investigations, but included non-investigatory duties.  (*Id*. at 111.)  Finally, the Court instructed the jury that if it found the call to Plaintiff was made in the ordinary course of Defendants' duties, it must find for them on the Title III claim.  (*Id*.)  The jury instead found for the Plaintiff, rejecting Defendants' evidence that they acted in the ordinary course of their duties.

Plaintiff presented sufficient evidence to support the jury's finding.  Defendants presented evidence that the recorded lines in the police barracks were sometimes used by

9

troopers (calling both in and out) for administrative purposes such as requesting personal/sick days or covering shifts. However, Plaintiff testified that it was common practice for one officer to inform another if the originator called from a recorded line and that he received no such notification from Defendant Oliphant. (Trial Tr. vol. 2, 96-98.) Further, Plaintiff's counsel cross examined Defendant Oliphant on the PSP communications manual in an effort to establish that Oliphant's use was not consistent with the policies and procedures expressed therein on recording and accessing recorded calls. (*Id.* at 78-80.) Additionally, Plaintiff presented evidence that the call was made in order to gather information regarding Plaintiff's Worker's Compensation claim and that its recording for that purpose was improper because neither Defendant had responsibility for investigating such claims. To this end, he presented testimony by Joseph Plant, then-current union president for Plaintiff's troop, that Altavilla said he was instructed to make the call by someone in Harrisburg, likely a representative of the human resources office. (Trial Tr. vol. 1, 124.)

Viewing the evidence in the light most favorable to Plaintiff and giving him the advantage of all reasonable inferences, the jury could reasonably conclude from evidence presented by Plaintiff that the recording was not ordered or carried out in the ordinary course of Defendants' duties. The jury could reasonably have found it credible that Altavilla was motivated to gather information regarding Plaintiff's worker's compensation claim, and thus did not have an "ordinary" reason for the call. It reasonably could have inferred from evidence regarding the manner of the call, its recording, and its copying thereafter, that it was not recorded in an "ordinary" fashion or for an "ordinary" purpose. Because there is legally sufficient evidence to support the jury's finding that the law enforcement exception did not apply to Defendants' conduct, the Court will deny Defendants' renewed motion for

judgment as a matter of law on this ground.

    **II.**    **Motion for a New Trial or Remittitur**

    <u>A.</u>    <u>Re-Cross of Plaintiff</u>

       Defendants argue that a new trial should be granted because the Court did not allow a re-cross examination of Plaintiff on what they argue was a critical issue.  On cross examination of Plaintiff, Defendants' counsel inquired about his knowledge of the device used to play beeps on the recorded telephone lines at the police barracks.  The following colloquy took place:

> Q:    Now, do you know anything about the beep box that is utilized to put the beeps on the tape communication lines at the state police?
>
> A.    You mean the way the system works or how the device works or --
>
> Q:    Do you know anything about it?
>
> A:    I know there's a little black box about the size of, I would say, a pack of Wood's matches that's attached to the line.  And the lines are just plugged in both sides.
>
> Q:    It's my understanding that you knew about this box because you worked desk; is that correct?
>
> A:    Yes, ma'am.
>
> Q:    Okay.  And would you have known about the beep box if the beep box hadn't needed to be repaired on occasion?
>
> A:    (no audible response.)
>
> Q:    Isn't that what you testified in your deposition?
>
> A:    Yes, I saw repair.  You can visibly see the box.
>
> Q:    Had you hadn't it seen it repaired, isn't it - - wasn't it your testimony in the deposition that you wouldn't have thought about the beep box?
>
> A:    I believe so, yes.

Q:    Prior to working desk, did you know what made the beeps on the recorded lines?

A:    No.  I mean -- not really.

Q:    You never unhooked the beep box, have you?

A:    No, ma'am.

Q:    And the state police regulations specifically don't allow you to deactivate that, am I correct?

A:    Correct, yes, ma'am.

(Trial Tr. vol. 2, 122-123.)

On redirect examination, the following colloquy took place between Plaintiff and his

counsel:

Q:    Now, Attorney Reynolds asked you about the beep box as she referred to it.  And she asked you if you know about and how it works.  Your answer was yes?

A:    Correct.

Q:    What do you know about this box, sir?

A:    As I stated before, it's about the size of a matchbox with -- it connected to the phone line.  Someone calls in and takes the emergency, I was involved in a crash -- actually it emits a beep on the line so the person calling can actually hear an audible beep on the line.

Q:    Now, to your knowledge what happens if you just remove that one plug from the beep box?

A:    There's two plugs.  If you remove either one, I'm not sure if it matters, the beep would still transmit to the -- our end  -- to the state police end but not to the citizen's end.

Q:    So the caller -- the person on the other end of the phone wouldn't know there was a beep there?

A:    Correct.

(*Id*. at 144-145.)

Following redirect examination, the Court did not allow Defendants' counsel to re-cross examine Plaintiff on his responses.  Defendants argue that the Court erred in disallowing re-cross.  They further argue they were prejudiced by the error because Plaintiff's response on redirect examination was the only evidence that beeps could be removed from one end of the telephone line, but not the other.

Defendants cite *United States v. Riggi*, 951 F.2d 1368 (3d Cir. 1991), for the proposition that a court errs in imposing a blanket prohibition on re-cross examination where new information is elicited on redirect examination.  This case is inapposite for two reasons.  First, the trial court in *Riggi* initially placed a blanket prohibition on all re-cross examination for the entire trial, *id.* at 1373, which is not the case here.  Second, *Riggi* was a criminal case holding that re-cross examination was required by the Confrontation Clause of Sixth Amendment, *id*. at 1375, which does not apply to civil cases such as this.  Rather, this situation is subject to the general rule that the "conduct of trial and the orderly presentation of testimony are committed to the sound discretion of the trial judge...."  *Id*.; *see also* Fed. R. Evid. 611(a) ("the district court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence").

Even assuming the Court erred in disallowing re-cross, a new trial is nonetheless unwarranted because the decision did not prejudice Defendants.  An error in admitting or excluding evidence cannot be grounds for a new trial unless it affects the substantial rights of the parties.  Fed. R. Civ. P. 61.  A new trial is only warranted where it is "highly probable" that the erroneous exclusion of evidence contributed to the judgment.  *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 924 (3d Cir. 1985).

13

Defendants argue they would have questioned Plaintiff on re-cross regarding the basis for his assertion that beeps could be removed from one end of a telephone line but not the other.  However, none of the three claims considered by the jury specifically required that the beeps be removed from *one end* of the line in order to find liability.  Rather, it was relevant to each claim whether there were beeps on the line audible to Plaintiff.[2]  Plaintiff testified that he did not hear beeps during the call.  (Trial Tr. vol. 2, 96.)  Corporal Gerald Williams testified that he did not hear beeps in the portion of the call he overheard.  (*Id.* at 9.)  Trooper Ronald Zukosky, the troop communications specialist, testified he was not sure whether he heard beeps in the portion of the call he overheard while copying the conversation.  (*Id.* at 224-25.)  In addition, Trooper Zukosky and defense witness George Gannis both testified that the volume of the beeps on a recorded line in the barracks could be turned up or down.  (*Id.* at 232, 253.)  The jury was not required to conclude that beeps were removed from one side of the recorded line in order to conclude that Plaintiff did not hear any beeps.  The Court cannot determine, therefore, it is "highly probable" that

---

[2]      As to the Fourth Amendment claim, the presence or absence of audible beeps was relevant to whether Plaintiff had a reasonable expectation of privacy.  *See In re State Police Litig.*, 888 F. Supp. 1235, 1256 (D. Conn. 1995) (notice may defeat reasonable expectation of privacy).  Similarly, Title III required that Plaintiff have a reasonable expectation of privacy to prove Defendants' liability.  *See Pattee v. Georgia Ports Authority,* 512 F.Supp.2d 1372, 1377 n. 5 (S.D.Ga. 2007) (noting that the legislative history of Title III demonstrates that Congress intended the statute's definition of oral communication to parallel the reasonable expectation of privacy test).  Regarding the Pennsylvania Wiretap Act, the presence of beeps was relevant to whether Defendants fell within the exception to the Act which excludes from liability the use of a communication system that, among other requirements, "employs a periodic warning which indicates to the parties to the conversation that the call is being recorded."  18 Pa. Cons. Stat. Ann. § 5704(3).

14

disallowing re-cross of Plaintiff contributed to the jury's verdict against Defendants.

Moreover, Trooper Zukosky gave testimony directly conflicting with Plaintiff's assertion that beeps could be removed from only one side of the recorded line.  Where the evidence is in conflict, and subject to two (2) or more interpretations, the trial judge should be reluctant to grant a new trial.  *Klein v. Hollings,* 992 F.2d 1285, 1295 (3d Cir. 1993).  The following colloquy took place between the Court and Trooper Zukosky:

> THE COURT: This mechanism [that creates the beeps on the line], can you disconnect the listener's portion as far as the beep is concerned and keep the beep on the state police line at the same time and therefore on the recording?
>
> THE WITNESS: To the best of my knowledge, if beep is on the -- if you're hearing the beep in the handset --
>
> THE COURT: Meaning the person at the state police barracks?
>
> THE WITNESS: Right. Basically whatever the handset hears to my knowledge, that's what is being recorded on the line.
>
> THE COURT: You know of no way of disconnecting the listener's phone from beeping?
>
> THE WITNESS: Exactly.  I don't.

(Trial Tr. vol. 2, 235-236, Date.)

In sum, even assuming the Court erred in disallowing recross of the Plaintiff regarding the basis of his knowledge of the beep box, the error did not cause substantial prejudice as the evidence was not indispensable to the jury's determination; there was ample other evidence on the presence or absence of beeps on the telephone line; and the Defendants had the opportunity to present evidence to contradict Plaintiff's assertion.

B.    Cross Examination of Plaintiff on Specific Instance of Conduct

Defendants argue they are entitled to a new trial because the Court erred in disallowing cross examination of Plaintiff regarding an instance of prior conduct bearing on Plaintiff's credibility.  On cross examination, Defendants' counsel sought to question Plaintiff on an injury he suffered during a skiing trip two (2) years prior to trial.  Plaintiff's counsel objected.  Defense counsel made an offer of proof that she intended to show Plaintiff asked a fellow officer to lie for him and say he was hurt on duty in order to get disability benefits.

Defense counsel sought to introduce the testimony as evidence of a specific instance of conduct attacking Plaintiff's character for truthfulness pursuant to Federal Rule of Evidence 608(b).[3]  Rule 608(b) provides that a court has discretion to admit or deny such evidence.  Rule 608(b) is also subject to the balancing test of Federal Rule of Evidence 403, requiring that the probative value of evidence not be outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury.  Fed. R. Evid. 608(b) advisory committee's notes.  In this case, the Court determined that the danger of unfair prejudice— because Plaintiff was also receiving benefits for a work-related injury at the time of the telephone call at issue—outweighed its probative value in attacking his credibility.

Defendants argue that this the prior instance of conduct was particularly indicative of

---

[3]    Rule 608(b) provides:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in rule 609 ... may ... in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness ....

16

untruthfulness precisely because Plaintiff had an ongoing workman's compensation claim with the same employer at the time of the events giving rise his claims.  However, Plaintiff's disability claim is irrelevant to whether Defendants illegally recorded his telephone call and no more probative than any other evidence generally attacking his character for truthfulness. The Court's exercise of discretion in excluding the evidence was not error requiring a new trial.

> C.    Good Faith Defense

Defendants next argue a new trial should be granted because the Court did not instruct the jury on the good faith defenses they argue are available under Title III and the Pennsylvania Wiretap Act respectively.

> *1.    Good Faith Defense under Title III*

18 U.S.C. § 2520(d) provides:

A good faith reliance on –

> (1)    a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization;
>
> (2)    a request of an investigative or law enforcement officer under section 2518(7) of this title; or
>
> (3)    a good faith determination that section 2511(3) or 2511(2)(i) of this title permitted the conduct complained of;

is a complete defense against any civil or criminal action brought under this chapter or any other law.

Defendants argue that they relied in good faith on a "statutory authorization," within the meaning of § 2520(d) by relying on the law enforcement exception of 18 U.S.C. § 2510(5)(a)(ii).  The Court has found no case law from the U.S. Court of Appeals for the Third Circuit on whether the exception provision of § 2510(5)(a)(ii) may serve as a "statutory

authorization" under  § 2520(d).  For several reasons, the Court concludes that it may not.

First, at least one court of appeals has concluded that "Title III provides no basis for a good faith addition to the law enforcement exception."  *Abraham v. County of Greenville*, 237 F.3d 386, 390 (4th Cir 2001).  In so holding, the court reasoned:

> It is not our place to create a good faith exception where one does not exist. *See* 18 U.S.C. § 2520(d) (creating certain good faith defenses for violations of the wiretapping statute). The Act puts the onus upon the wiretapper to ensure that his activities are appropriate.

*Id*.  The *Abraham* court thus necessarily concluded the law enforcement exception was not encompassed by the "statutory authorization" language of § 2520(d).

Second, a straightforward interpretation of the provision as a whole supports the conclusion that "statutory authorization" was not intended to encompass an internal reference to another provision of Title III.  The two subsections following that containing the "statutory authorization" language contain internal cross-references to specific provisions of Title III, providing them good faith defenses.  If Congress had intended to provide a good faith defense for the law enforcement exception,[4] it would have similarly provided a specific statutory reference to § 2510(5)(a)(ii) in § 2520(d).  *See Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

---

[4]     In fact, the legislative history of § 2520(d) reveals that it was intended to provide statutory protection for communications providers cooperating with law enforcement investigations.  *See Rice v. Rice*, 951 F.2d 942, 945 (8th Cir. 1991) (citing Senate report).

Finally, the Court agrees with several federal courts of appeals holding that a mistake of law cannot form the basis for a good faith defense under Title III. *See Campiti v. Walonis*, 611 F.2d 387, 394-95 (1st Cir. 1979); *Heggy v. Heggy*, 944 F.2d 1537, 1542 (10th Cir. 1991). In *Williams v. Poulos*, 11 F.3d 271, 285 (1st Cir. 1993), the First Circuit Court of Appeals declined to reach the question of whether the business telephone exception to Title III, found at § 2510(5)(a)(i), is encompassed in the "statutory authorization" language because defendant's belief that it applied was based on a mistake of law. The court concluded, "nothing in § 2520(d) supports a conclusion that the good faith defense applies where a defendant mistakenly believes that there exists a statutory authorization for wiretapping." *Id.*

Defendants here argue in favor of a good faith defense for a mistake of law. A mistake of law occurs when "a party, having full knowledge of the facts, comes to an erroneous conclusion as to their legal effect." *Blacks Law Dictionary* 1001 (6th ed. 1990). Defendants argue they believed their actions to constitute conduct in the ordinary course of their duties and, even if incorrect, they were entitled to jury consideration of that subjective belief.

The Court concludes they were not entitled to a good faith instruction based on their mistake of law. Moreover, the Court concludes that the law enforcement exception is not encompassed in the "statutory authorization" language of § 2520(d). Therefore, Defendants are not entitled to a new trial based on the Court's refused to give a Title III good faith instruction.

*2.     Good Faith Defense under the Pennsylvania Wiretap Act*

Defendants argue they were entitled to an instruction on the good faith defense available under the Pennsylvania Wiretap Act because they relied on the statutory exception found in 18 Pa. Cons. Stat. § 5704(3).[5]

Section 5725 of the Act provides a good faith defense with an explicit internal reference to its statutory provisions.  The statute provides: "It is a defense to an action brought pursuant to subsection (a) that the actor acted in good faith reliance on a court order or the provisions of this chapter." 18 Pa. Cons. Stat. § 5725(c).  However, the Pennsylvania Supreme Court has interpreted this provision similarly to the above-mentioned federal courts holding that a mistaken interpretation of the law cannot be the basis for a statutory good faith defense.  In *Boettger v. Miklich*, 534 Pa. 581 (1993), the state high court held that defendant police officers could not assert the good faith defense where their conduct in disclosing the

---

[5]     The Pennsylvania Wiretap Act creates a civil cause of action for "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter."  18 Pa. Cons. Stat. § 5725(a).  To prove a violation of the Act, a plaintiff must show a defendant intentionally intercepted, endeavored to intercept, or procured another person to intercept or endeavor to intercept any wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.  However, the statute provides an exception to liability where: (1) the line was part of a police communications system used to record telephone communications coming into and going out of the communications system of a police department; (2) the telephones were limited to the exclusive use of the communication system for administrative purposes; (3) the communication system employed a periodic warning which indicates to the parties to the conversation that the call is being recorded; (4) the department provided that all recordings, notes, and transcriptions made from this system may be destroyed at any time, unless required with regard to a pending matter; and (5) at least one non-recorded telephone line was made available for public use at the police department. 18 Pa. Cons. Stat. § 5704(3).

contents of a lawful wiretap was not permitted under any provision of the Act.  The court explained:

> Once it was established that the [conduct] at issue was not permitted by a court order or the provisions of the Wiretap Act itself, there was no reason to reach beyond the words of the statute in order to interpret the good faith defense. Although the Commonwealth court found that disclosure was not authorized by the Wiretap Act, it went on to find that the appellee's interpretation of the Wiretap Act was reasonable and they therefore were entitled to the good faith defense.  This analysis was improper.  As the trial court so aptly noted in rejecting this argument, "to adopt the defense view would be to rewrite the statute to make a good faith defense available to those who reasonably misinterpret the provisions of the chapter."

*Id*. at 588-89 (footnote and internal quotation omitted).  Here, Defendants argue they are entitled to a good faith defense jury instruction because a subjective belief that the § 5704(3) exception applied, even if erroneous, would shield them from liability.  Based on *Boettger*, the Court does not agree and concludes Defendants are not entitled to assert a good faith defense based on a subjective misinterpretation of a provision of the Act.

D.    Definition of "Administrative Purposes"

Defendants argue they are entitled to a new trial because the Court failed to instruct the jury on the definition of the term "administrative purposes," as used in 18 Pa. Cons. Stat. § 5704(3).  They argue this failure harmed them because the jury could have interpreted the term as limited to investigative police work, not including personnel matters.   However, this interpretation is at odds with the common understanding of the word "administrative."  The Cambridge Dictionary of American English defines "administrative" as an adjective referring to the noun "administration," defined as "the management or control of an organization." *Cambridge American English Dictionary* (2d ed. 2007).   Webster's Dictionary defines

21

"administrative" as "of, belonging to, proceeding from, or suited to administration or an administration: executive." *Webster's Third New International Dictionary* (2002). "Administration" is defined as "performance of executive duties: management, direction, superintendence." *Id.* The common understanding of "administrative" is consistent with the meaning Defendants argue should have been made explicit through instruction by the Court. Moreover, the Court has discovered no case law suggesting that the term has a legal definition that differs from its common meaning. "[A] 'trial court need not define specific statutory terms unless they are outside the common understanding of a juror or are so technical or specific as to require a definition.'" *United States v. Jackson*, No. 97-cv-2861, 2000 U.S. Dist. LEXIS 1297, *25 (E.D. Pa. Feb. 14, 2000) (quoting *United States v. Chenault*, 844 F.2d 1124, 1131 (5th Cir. 1988)); *see United States v. Morris*, 928 F.2d 504, 511 (2d Cir. 1991) (same). Because the term "administrative purposes" was not outside the common understanding of a juror, the Court did not err in failing to instruct the jury on its definition.

### E.   Beep Tones on the Telephone Line

Defendants argue that a new trial should be granted because the Court gave improper instructions on Plaintiff's Fourth Amendment and Title III claims by instructing the jury that it could only find for the Defendants if the jurors found there were beeps on the telephone line.

### 1.   Fourth Amendment Claim

The Court instructed the jury that liability for recording Plaintiff's call under the Fourth Amendment is a two-fold inquiry, requiring that Plaintiff have both a subjective and an

objective expectation of privacy.  (Trial Tr. vol. 4, 105-106.)  It then explained that notice of the recording to Plaintiff, such as beep tones sounding on the line, can defeat his subjective and objective expectation of privacy.  (*Id*. at 106-107.)  Finally, the Court instructed the jury that if it found there were beep tones on the telephone line during the call between Plaintiff and Defendant Oliphant, it must find for Defendants and vice versa.  (*Id*. at 107.)

This instruction was a correct application of the applicable law.  Under *Katz*, it is established that a person has a reasonable expectation of privacy in the content of his private telephone call.  *Katz*, 389 U.S. at 360-61 (Harlan, J., concurring).  However, that reasonable expectation may be defeated where the person is given notice of the recording. *See In re State Police Litig*., 888 F. Supp. at 1256 (notice may defeat reasonable expectation of privacy); *Abbott v. Village of Winthrop Harbor*, 953 F. Supp. 931, 943 (N.D. Ill. 1996) ("it is a violation [of the Fourth Amendment] to wiretap or otherwise monitor the private communications of another without authorization, notice, or consent"); *PBA Local No. 38 v. Woodbridge Police Dep't*, 832 F. Supp. 808, 818 (D.N.J. 1993) ("It is clear that plaintiffs did not have a reasonable expectation of privacy in conversations which took place over the [police headquarter's] beeped telephone lines.").

Here, there was no dispute that Defendant Oliphant, at Defendant Altavilla's direction, initiated a call to Plaintiff and recorded it without notifying him that the call was made from a recorded line.  However, it was disputed whether there were audible beeps playing periodically on the telephone line that would serve to notify Plaintiff, who as an officer was aware of the significance of beeps on the police barrack telephone lines, that the call was recorded.  Such notice would have destroyed his reasonable expectation of privacy.  The

23

presence or absence of beeps on the line was therefore the critical question in determining liability under the Fourth Amendment claim.

    *2.    Title III Claim*

    In instructing the jury on Plaintiff's Title III claim, the Court delineated between its instructions on liability for a violation of the statute and the law enforcement exception to liability.  The Court first instructed that Plaintiff had to show three elements to establish a violation of Title III: that defendants (1) intentionally (2) intercepted (3) an oral communication of the Plaintiff.  (Trial Tr. vol. 4, 108.)  Because evidence of the first two elements was undisputed, liability turned on the third element.  The Court instructed the jury that "oral communication" means a communication "uttered by a person who exhibits an expectation that his words are not subject to interception under the circumstances."  (*Id*.) Court explained that this test mirrors the Fourth Amendment reasonable expectation of privacy test.  (*Id*. at 108-110.)  Thus, as in the Fourth Amendment claim, the critical inquiry to determine liability was the presence or absence of beeps on the telephone line during the call between Plaintiff and Defendant Oliphant.  After liability instructions, the Court instructed the jury on the requirements of the law enforcement exception to Title III and instructed that, if the Defendants met the exception, the jury must find for them.

    The Court's instructions on beeps in the Title III liability context were not a misapplication of applicable law.  The three required elements were adopted from the text of the statute.  18 U.S.C. § 2511(a).  The definition of "oral communication" was also taken from the text of the statute.  *See* 18 U.S.C. § 2510(2) (oral communication means "any oral communication uttered by a person exhibiting an expectation that such communication is not

24

subject to interception under circumstances justifying such expectation"). Finally, "[t]he legislative history of this section demonstrates that Congress intended this definition of oral communication to parallel the reasonable expectation of privacy test set out in [*Katz*]." *Kee v. City of Rowlett*, 247 F.3d 206, 211 n. 8 (5th Cir. 2001) (citing cases and Senate report).

Defendants appear to argue the Court instructed the jury that it was required to find for Plaintiffs if it found there were no audible beeps on the telephone line, regardless of the law enforcement exception. That is not the case. The Court gave separate instructions on liability, in which it was appropriate to discuss beeps, followed by instructions on the exception, involving no discussion of beeps. The jury was instructed that if the exception applied, it must find for Defendants. Consequently, the Court's instructions involved no prejudicial misapplication of law requiring a new trial.

F.    Passion or Prejudice of Jury

Finally, Defendants argue a new trial should be granted because the verdict was clearly the result of passion or prejudice by the jury. "[A] District Court reviewing a jury verdict has an 'obligation ... to uphold the jury's award if there exists a reasonable basis to do so.'" *Evans v. Port Auth. of N.Y. & N.J.*, 273 F.3d 346, 351 (3d Cir. 2001) (quoting *Motter v. Everest & Jennings, Inc.*, 883 F.2d 1223, 1230 (3d Cir. 1989)). A court may not set aside an award merely because it would have awarded lesser damages, but it may grant a new trial if the verdict is shown to result from passion or prejudice. *Id*. at 352. The size of the award alone is not enough to warrant a new trial. *Id*. However, a district court has an obligation to ensure that "the compensatory damage award finds support in the record and that the jury did not 'abandon analysis for sympathy.'" *Id*. (quoting *Gumbs v. Pueblo Int'l,*

25

*Inc.*, 823 F.2d 768, 773 (3d Cir. 1987)).

Defendants advance several reasons to show the jury award of five hundred and one thousand, four dollars ($501,004) was the result of passion or prejudice: (1) the evidence cannot support the award of compensatory damages; (2) the jury awarded over twice the compensatory damages for Plaintiff's state law claim as his Fourth Amendment claim based on the same underlying evidence; and (3) Plaintiff's counsel made misrepresentations during closing arguments.  The Court will not address the third argument because it is waived by Defendants' failure to object at the time of trial.  *See Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998) ("a party who fails to object to errors at trial waives the right to complain about them following trial"); *see also Matsushita Elec. Indus. Co., Ltd. v. Samsung Elecs. Co., Ltd.*, No. 02-cv-0336, 2006 U.S. Dist. LEXIS 80145, at **41-42 (holding waived objection to allegedly improper statements during closing argument could not be basis for new trial).

As to the first argument, the Court disagrees that there is insufficient evidence on the record for the jury to have awarded compensatory damages.  Plaintiff testified to suffering emotional injury after finding out his telephone call was recorded.  He testified that he felt "shocked," "assaulted," and "sick."  (Trial Tr. vol. 2, 101-102.)  He further testified that as a result of the discovery he lost sleep and weight worrying about the significance of Defendants' actions and whether he was going to lose his job. (*Id*. at 102-103.)  He asserted that his relationship with his wife suffered because he was depressed.  (*Id*. at 103.)  The Court instructed the jury that Plaintiff had the burden of proving his injury and identified emotional and mental harm as the only source of the damages he claimed.  (Trial Tr. vol. 4, 113.)  A jury could reasonably conclude from this evidence that Plaintiff suffered emotional

26

injury.

Defendants next argue that the same damages testimony supported Plaintiff's injury under both the Fourth Amendment and state law claims.  The jury awarded thirty-nine thousand, eight hundred thirteen dollars ($39,813) in compensatory damages against each Defendant for the Fourth Amendment claim and ninety-one thousand, two hundred fifty dollars ($91,250) against each for the Pennsylvania Wiretap Act claim.  Defendants argue there is no logical explanation for this outcome, evidencing jury passion or prejudice. However, it is conceivable that the jury apportioned a total sum of compensatory damage for the same emotional harm between the two claims.  Dividing compensatory damages for the same injury  between claims is a permissible result.  *See Gentile v. County of Suffolk*, 926 F.2d 142, 154 (2d Cir. 1991) (upholding separate damage awards for claims with overlapping injury where it appeared the jury divided an aggregate sum between them).

Whether the jury's apportionment is supported by the record is a question appropriate for the Court's discussion of Defendant's motion for remittitur, but does not prompt the conclusion that the jury abandoned analysis for sympathy.  The Court therefore does not agree that the verdict was the result of passion or prejudice warranting a new trial.

### III.    Motion for Remittitur

Defendants assert several bases for remittitur.  First, they argue the compensatory damages awarded by the jury should be substantially reduced because they are not rationally based upon the evidence.  Second, they argue the Court improperly assessed statutory damages under Title III.  Third, they argue the Court improperly allowed jury consideration of damages under the state law claim.  Finally, they argue there is insufficient

evidence to support an award of punitive damages.

A.    Compensatory Damages

As discussed above, it is not *per se* irrational for the jury to apportion damages for the same injury between different claims.  However, "[t]here must be a rational relationship between the specific injury sustained and the amount awarded."  *Gumbs*, 823 F.2d at 773. Here, the difficulty with the jury's total compensatory damage award is its award of different amounts under the Fourth Amendment and state law claims where both were supported by the same misconduct and resulted in the same injury.  Specifically, Plaintiff testified that he was injured when he found out that Defendants recorded his telephone call.  (Trial Tr. vol. 2, 101.)  Recording the call constituted the conduct underlying violation of both the Fourth Amendment and the Pennsylvania statute.  As to Plaintiff's injury, his counsel argued the following in closing argument:

> The compensatory damages for both the Fourth Amendment violation and the Pennsylvania Wiretap Act would be to compensate this man for the violation of his rights.  To compensate him for the violation that felt when he found out that his privacy had been invaded.  To compensate him for the stress, the depression he suffered, the pain this has caused and still causes him.

(Trial Tr. vol. 4, 78-79.)

Thus, while the jury was entitled to apportion damages between theories of recovery, its means of doing so here was not rationally based on the record.  The aggregate sum of compensatory damages awarded by the jury—one hundred thirty-one thousand, sixty-three dollars ($131,063) against each Defendant for a total of two hundred sixty-two thousand, one hundred twenty-six dollars ($262,126)—is consequently not rationally related to the specific

28

injury Plaintiff suffered.  In such circumstances, a remittitur is an appropriate remedy.  *See Spence v. Bd. of Educ.*, 806 F.2d 1198, 1201 (3d Cir. 1986) ("The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive.").  To impose a remittitur, the Court must determine an appropriate award.  To do so, "the prudent course is to evaluate the record in light of damage awards for pain and suffering and emotional distress rendered in other cases."  *Hall v. Pennsylvania Department of Corrections*, No. 3:CV-02-1255, 2006 U.S. Dist. LEXIS 68670, *66 (M.D. Pa. Sept. 25, 2006) (Vanaskie, J.) (citing *Delli Santi v. CNA Insurane Cos.*, 88 F.3d 192, 206 (3d Cir. 1996)).  "The means employed should enable the Court to attain its objective of setting damages at the 'maximum recovery that does not shock the judicial conscience.'"  *Id.* at **66-67 (quoting *Evans*, 273 F.3d at 355).

The only evidence of injury presented in this case was Plaintiff's testimony regarding his emotional harm upon learning his telephone call with Defendant Oliphant was intercepted.  (Trial Tr. vol. 2, 101-103.)  Courts in the Third Circuit have not approved high awards where a plaintiff presents solely his own testimony in support of relatively non-severe emotional harm.  *See, e.g., Spence*, 806 F.2d 1198*; Abrams v. Lightolier*, Inc., 841 F. Supp. 584 (D.N.J. 1994); *Valentin v. Crozer-Chester Med. Ctr.*, 986 F. Supp. 292 (E.D. Pa. 1997).  The Court finds a helpful comparison between the facts of emotional harm presented in this case and those of *Glass v. Snellbaker*, No. 05-cv-1971, 2008 U.S. Dist. LEXIS 71241 (D.N.J. Sept. 17, 2008).

In *Glass*, the district court reduced a jury award of two hundred fifty thousand dollars ($250,000) for emotional harm to fifty thousand dollars ($50,000).  In a § 1983 suit for

29

violation of his First Amendment rights, plaintiff former deputy police chief alleged he was

emotionally harmed when transferred from a field to an administrative position within the

police department and subsequently ignored by his transferring superior. *Glass*, 2008 U.S.

Dist. LEXIS 71241, at **7-8.  There as well, plaintiff's only supporting evidence was his own

testimony.  *Id*. at *76.  He testified that:

> Although he reported feeling humiliated and emotionally devastated, he
> continued coming to work just as before and reported no changes in
> sleep or other emotional effects.  He also did not suffer financial stress
> at that time, as his salary and benefits continued as long as he remained
> on the job.  His damage to professional pride was hurtful, but is difficult
> to measure as actual damages.  Plaintiff sought no counseling or other
> mental health treatment and no family member or coworkers testified
> about the emotional impact that Defendants' conduct had on him.

*Id*. at *72.  The court found the evidence supported the conclusion that plaintiff's humiliation

continued for two years, the time period in which he was subjected to the superior's

mistreatment.  *Id*. at *76.  After examining emotional harm awards in other § 1983 cases, the

court concluded that fifty thousand dollars ($50,000) was the highest award supported by the

evidence.  *Id*. at *80.

Here, Plaintiff testified to feeling shocked, assaulted, and sick when he found out his

call had been recorded.  He testified to a somewhat more intense emotional reaction than

the *Glass* plaintiff, in that he suffered anxiety to the point of sleep loss and a strained

relationship with his wife due to feeling depressed.  According to Plaintiff, his anxiety was

caused, at least in part, by the stress of financial uncertainty because he was unsure

whether his superiors' actions indicated his job or benefits were in jeopardy.  On the other

hand, this anxiety could only have been short-lived as he returned to work less than two

months later.  In contrast, the interactions causing the *Glass* plaintiff's emotional harm lasted over a period of two years.  Neither plaintiff suffered any economic harm; neither suffered any harm to their reputation; and neither sought medical attention as a result of their emotional injury.

As the Court finds relatively comparable proof of harm in this case as in *Glass*, it similarly finds that fifty thousand dollars ($50,000) is the highest award supported by the evidence.  This total sum results in damages of twenty-five thousand dollars ($25,000) against each Defendant.  The Court will therefore order Plaintiff to remit two hundred twelve, one hundred twenty-six dollars ($212,126) in total compensatory damages.  If Plaintiff does not accept this remittitur, there shall be a new trial on damages for emotional harm.  *See Blakey v. Continental Airlines*, 992 F. Supp. 731, 741 (D.N.J. 1998) (citing *Scott v. Plante*, 641 F.2d 117, 136-37 (3d Cir. 1981), vacated on other grounds, 458 U.S. 1101 (1982)) ("where the facts as to compensatory damages are in dispute, a court may not remit a plaintiff's damages without her consent, but must offer the plaintiff an option between accepting the remittitur or submitting to a new trial").

B.    Title III Compensatory Damages

Defendants next argue that the Court erred in awarding statutory damages under Title III against each Defendant.  18 U.S.C. § 2520(c)(2)(B) provides that a court may assess statutory damages of "whichever is the greater of $100 a day for each day of violation or $10,000."  After the jury found Defendants liable for violation of Title III, the Court awarded ten thousand dollars ($10,000) against each Defendant.  (Doc. 97.)

The Court agrees with Defendants' argument that it erred in awarding damages

individually rather than jointly.  The Ninth Circuit Court of Appeals appears to be the only federal appeals court to have ruled on the issue directly.  It held that damages may only be awarded jointly against multiple defendants responsible for the same Title III violation. *Jacobson v. Rose*, 592 F.2d 515, 520 (9th Cir. 1978); *see also Biton v. Menda*, 812 F. Supp. 283, 284 (D.P.R. 1993) (following *Jacobson*); *Farberware, Inc. v. Groben*, No. 89-cv-6240, 1995 U.S. Dist. LEXIS 15409, at **13-14 (S.D.N.Y. Sept. 18, 1995) (same).   Allowing recovery against multiple defendants for a single violation means that "a plaintiff could recover actual or liquidated damages in a § 2520 action in excess of actual loss."  *Id*.  This may result in a windfall for a plaintiff untethered to the actual harm incurred by the Title III violation.  The Court agrees with the Ninth Circuit Court of Appeals.  Consequently, it erred in awarding statutory damages against Defendants individually and will alter the award to ten thousand dollars ($10,000) in damages to be assessed jointly and severally against both Defendants.  The Plaintiff will be ordered to remit ten thousand dollars ($10,000) of the total sum of twenty thousand dollars ($20,000) awarded for statutory damages under Title III.

C.     Damages under Pennsylvania Wiretap Act

Defendants argue that the Court erred in allowing the jury to decide compensatory damages under the Pennsylvania Wiretap Act.  In addition, they argue that punitive damages are not available under the Act and the Court therefore erred in allowing the jury to assess such damages.  Defendants did not object to the Court's jury instructions or the special verdict form on either of these grounds and they are thus waived.  *See* Fed. R. Civ. P. 51(c) (regarding timely objections to instructions); *Inter. Med. Supplies, Ltd. v. Ebi Med. Sys., Inc.*, 181 F.3d 446, 463 (3d Cir. 1999) (failure to object to verdict sheet at time jury received it

32

constitutes waiver of objection).

    D.    <u>Punitive Damages</u>

Finally, Defendants argue that there is no evidence on the record to support an award of punitive damages for the federal or state claims.  The Court disagrees.  The jury was given separate punitive damage instructions for the federal claims and the state law claim.  As to the federal claims, the Court instructed the jury that, to award punitive damages, it must find each Defendant acted maliciously or wantonly.  (Trial Tr. vol. 4, 116.)  The Court further instructed:

> A defendant is malicious when consciously desires to violate Federal Rights of which he is aware, or when he consciously desires to injure the plaintiff in a manner he knows to be unlawful ... A violation is wanton if the person committing ... the violation recklessly or callously disregarded the plaintiff's rights.

(*Id.*); *see also Third Circuit Model Civil Jury Instructions* § 4.8.3 (2009) (giving punitive damages standard in § 1983 cases).  As to the state claim, the Court instructed:

> If you find that the conduct of the defendants was outrageous you may award punitive damages.... A person's conduct is outrageous when it is malicious, wanton, willful, or oppressive, or shows reckless indifference to the interest of others.

(*Id.* at 118-19.); *see also Phillips v. Cricket Lighters*, 883 A.2d 439, 445-46 (Pa. 2005) (giving Pennsylvania punitive damages standard).

There is sufficient evidence in the record to support a punitive damages award under both standards.  First, Defendant Altavilla specifically directed Defendant Oliphant to telephone Plaintiff from a recorded line.  (Trial Tr. vol. 2, 54-56.)  Further, Plaintiff testified

that Defendant Oliphant did not inform him their call was being recorded, although it was the normal practice of officers to do so when calling each other from a recorded line in the barracks.  (*Id*. at 96-98.)  There was contested testimony suggesting that the telephone line could be manipulated so as not to emit audible beeps during the conversation and thereby alert Plaintiff to the fact that the call was recorded.  (*Id*. at 232, 253)  A jury considering the this evidence could reasonably find a basis for punitive damages.

### CONCLUSION

For the foregoing reasons, the Court will deny Defendants' Motion for Judgement as a Matter of Law pursuant to Federal Rule of Civil Procedure 50.  (Doc. 102.)  It will also deny their Motion for a New Trial pursuant to Federal Rule of Civil Procedure Rule 59.  (*Id*.)  Finally, it will grant in part and deny in part Defendants' Motion for Remittitur.  (*Id*.)  A remittitur will be granted as to a portion of the compensatory damages awarded by the jury as well as statutory damages awarded by the Court under Title III.  Plaintiff will be ordered to remit two hundred twelve, one hundred twenty-six dollars ($212,126) in total compensatory damages.  If Plaintiff does not accept this remittitur, there shall be a new trial on compensatory damages for emotional harm.  Plaintiff will also be ordered to remit ten thousand dollars ($10,000) of the twenty thousand dollars ($20,000) awarded by the Court as statutory damages under Title III.  Because the Court erred as a matter of law in determining the damage award under Title III, Plaintiff will not have the option to reject this remittitur in favor of a new trial.  Defendants' Motion for Remittitur will be denied in all other respects.

34

An appropriate Order follows.


February 13, 2009                            /s/ A. Richard Caputo
Date                                         A. Richard Caputo
                                             United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

MARIO J. DIANA,

      Plaintiff,

          v.

WILLARD OLIPHANT and CARMEN
ALTAVILLA,

      Defendants.

NO. 3:05-cv-2338

(JUDGE CAPUTO)

## ORDER

**NOW**, this  13th  day of February, 2009, **IT IS HEREBY ORDERED** that Defendants

Carmen Altavilla and Willard Oliphant's combined post-trial motions (Doc. 102) are

**GRANTED in part** and **DENIED in part** as follows:

    (1)    Defendants' renewed Motion for Judgment as a Matter of Law pursuant

           to Federal Rule of Civil Procedure 50 is **DENIED**.

    (2)    Defendants' Motion for a New Trial pursuant to Federal Rule of Civil

           Procedure Rule 59 is **DENIED**.

    (3)    Defendants' Motion for Remittitur is **GRANTED in part** and **DENIED in**

           **part** as follows:

        (A)    Plaintiff shall **REMIT** $212,126 of the total sum of compensatory

               damages awarded by the jury.  Should the Plaintiff refuse to

               accept $50,000 in compensatory damages, a new trial on the

               issue of compensatory damages for Plaintiff's emotional harm

               shall be conducted

(B)     Plaintiff shall **REMIT** $10,000 of the sum awarded by the Court

pursuant to 18 U.S.C. § 2520.

(C)     Defendants' motion for remittitur is **DENIED** in all other respects.


/s/ A. Richard Caputo
A. Richard Caputo
United States District Judge